## Boggs *v.* Boggs & Buhl.

*Corporations—Stockholders' agreement—Purchase of member's stock.*

An agreement among stockholders of a corporation providing that the holders of a majority of the common stock may declare that a stockholder has ceased to be a desirable associate either on account of incompetency, or personal conduct, and thereupon appraise and take his stock at its cash value, is a valid contract and binding upon all the parties to it; and if a majority after proper consideration and in good faith find that a particular member has ceased to be a desirable associate, and have also in good faith appraised such member's stock, the majority may by a bill in equity enforce the specific performance of the agreement, and compel a transfer of the member's stock at the appraisement fixed by the majority without any addition for good will.

In such a case where it appears that the common stock when issued had no value, that the persons owning it were required to be actively engaged in the management of the corporation, that the common stock was never sold on the market, and the preferred stock was subject to redemption at any time, the cash value of the common stock is the price shown by the value of the assets of the corporation applicable to it, when the appraisement was made.

Argued Nov. 1, 1906. Appeal, No. 183, Oct. T., 1906, by George B. Boswell, from decree of C. P. No. 2, Allegheny Co., April T., 1906, No. 124, on bill in equity in case of Russell H. Boggs et al. v. Boggs & Buhl, a corporation of the State of New Jersey, and George B. Boswell. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Bill in equity for specific performance. Before FRAZER, P. J.

From the record it appeared that Russell H. Boggs and Henry Buhl, Jr., were partners carrying on a dry goods and notion business in the city of Allegheny. On May 28, 1899, they organized a corporation under the laws of New Jersey under the name of Boggs & Buhl. This corporation took over the property and business of the firm, and preferred and common stock was issued therefor. Messrs. Boggs & Buhl, who received all the stock, transferred certain portions of it to some of their principal employees, including the defendant, George

B. Boswell. All of the holders of the common stock on April 20, 1899, entered into an agreement which is quoted below in the opinion of the court. On April 28, 1905, a meeting of the common stockholders was held at which all the common stockholders were present, except the defendant. At this meeting the following resolutions were offered and unanimously adopted :

" Resolved that the stock of Mr. George B. Boswell be appraised and redeemed in accordance with the agreement signed by all of the holders of the common stock of said corporation dated April 20, 1899, on account of his incompetency in overbuying and otherwise mismanaging departments under his control and because he by reason of his personal conduct has ceased to be a desirable associate.

" Resolved that the common stock of Boggs & Buhl Corporation held by Mr. George B. Boswell be appraised at $149.71 cash per share, which is the gross value of the stock as shown by the books of the corporation, and that said stock be redeemed and purchased at that price."

Other facts appear by the opinion of FRAZER, J., which was as follows :

The agreement upon which this proceeding is based is a valid contract and binding upon all the parties to it : Boswell v. Buhl, 213 Pa. 450. The portion of the contract particularly applicable to the question here involved is as follows :

" If in the opinion of the holders of the majority of the common stock of said corporation a holder of any common stock of said corporation should cease to be a desirable associate either on account of incompetency or personal conduct or if a holder of any common stock of said corporation shall voluntarily resign from his or her position, the holders of the majority of said common stock shall be at liberty and they are hereby empowered to appraise the cash value of said stock and redeem or purchase the same from said party, and said stock so purchased shall be divided or distributed among the holders of said common stock in proportion to the amounts of stock held by each."

The clause quoted confers upon the holders of the majority of the common stock power to determine (a) whether the

holder of common stock has ceased to be a desirable associate either on account of incompetency or personal conduct; and (b) to appraise and purchase the stock held by a stockholder who may become an undesirable associate. In this case on April 28, 1905, after notice to all holders of common stock of the company, a meeting was held for the purpose of determining whether or not the common stock held by defendant should be appraised and taken under the agreement of April 20, 1899, defendant being at that time no longer "actively engaged in the management" of the company either as an officer or employee. At that meeting it was unanimously resolved that defendant had ceased to be a desirable associate, and his stock appraised by more than a majority in interest of the stockholders at $149.71 per share in cash. Whether the making of the agreement of April 20, 1899, was judicious, is not a question for us to determine. The parties to the document had a right to make it, and having executed it with full knowledge of its contents, its terms are the law of the case and as such must be enforced against them and be observed by them : Boswell v. Boggs, supra. The contract being a binding obligation upon the parties, it seems to us the sole question for determination is, did complainants act in good faith; if they did, defendant must acquiesce in and submit to the action taken by them. Whether a holder of stock shall retain his common stock in the company depends entirely upon the opinion honestly exercised by his associates. Defendant had been with the company since its organization and the testimony shows no objection to him on the part of his associates until within the last two years of his association with them. During a portion of that time he was in ill health, which fact may have induced some of the acts his associates now complain of. However that may be, his associates by a unanimous vote determined that in their opinion he was no longer a " desirable associate," and that he should dispose of his stock in the manner provided by the agreement of 1899. Each stockholder called as a witness gave his reasons for voting as he did. The reasons given were in some respects trivial, but as a whole were, in our opinion, sufficient to negative bad faith upon their part. While many of the reasons given by the witnesses to support their action were either refuted by defendant, or to

some extent explained, it is apparent there was feeling among the small stockholders occasioned by defendant's conduct toward them, his absence from the store, and his refusal to acquiesce in the proposed transfer of the 1,500 shares of common stock by Messrs. Boggs and Buhl, and it is also apparent that the discontent of these stockholders, who were heads of the largest and most profitable departments of the store, would, if continued, act to the detriment of the company. All the stockholders were particularly interested in the success of the company, Messrs. Boggs and Buhl, not only on account of their large holdings, but also the pride they had in the business, and the other stockholders because of their investment in the preferred stock, which was no doubt large to them, and also in the future promise to them from the business. It was therefore vitally important to the interest of all that there should be harmony among the holders of the stock, and that all should be in constant attendance at the store and exercise their best efforts to extend and increase the business. Whether defendant was discharged from the company's service or quit voluntarily, we think is immaterial so far as this proceeding is concerned. He ceased to be actively engaged in the management of the company's business, and was, in the opinion of the other stockholders, deemed to be an "undesirable associate." They, therefore, had a right under the agreement of April 20, 1899, to appraise and redeem his stock.

In the event of the stock of a member being appraised and taken, the agreement provides that the appraisement shall be made by the holders of the majority of the common stock "and they are hereby empowered to appraise the cash value of said stock." In this case the cash value was fixed at $149.71 per share and was arrived at by ascertaining the value of the company's assets and deducting therefrom its liabilities and the par value of preferred stock, the difference representing the value of the common stock. The amount thus fixed was the value at the end of the fiscal year of the company, February 3, preceding. By bringing the statement down to date of appraisement the value was increased to $159.20 per share, against which was a claim of the commonwealth for bonus amounting to $117,000, or about $12.00 per share. Defendant's contention is that this appraisement is unreasonably be-

low what it ought to be in view of the profits applicable to the stock, and also because it does not include any allowance for good will, which was valued at $1,000,000 at the time of the formation of the corporation. At the organization of the company the common stock was not represented by any tangible property. It was valueless, and whether it should in the future have a value depended entirely upon an increase of the company's assets over and above the value of the preferred stock. This latter stock has preference at all times over the common stock, and in the event of the winding up of the corporation, no part of the funds realized from sale of the property can be applied to the common stock until all liabilities and the preferred stock and its accrued dividends have been fully paid. The testimony of both Mr. Boggs and Mr. Buhl is that the common stock represented nothing of value at the time it was issued and was given free of costs to the purchasers of the preferred. As the contract empowers a majority of the stockholders to appraise the value of a retiring holder's stock, and that having been done in this case, the appraisement must stand unless the testimony shows bad faith on the part of those who made it. Owing to the conditions attached to the stock, it has no market value; no one outside of those actively engaged in the management of the corporation could be induced to purchase it, and, while the earnings of the company have been large, the value of the stock can hardly be based upon the dividends declared upon it, for the reason that dividends may be discontinued at any time and the earnings used for other purposes. While what was intended by the words "appraise the cash value" of the stock is capable of more than one interpretation, it seems to us, taking the agreement as a whole and also considering the fact that the stock must always be held by a person engaged in the management of the company's business, the intention of the parties to the agreement was that " cash value" should be the sum shown by the value of the assets of the company applicable to the stock. This, it seems to us, is a fair and equitable standard for arriving at the common stock's value, and the rule which under all circumstances will most nearly do justice between the parties, in the event of an appraisement and redemption as in this case.

CONCLUSIONS OF LAW.

Under all the circumstances of this case, and viewing the testimony in its most favorable light to defendant, we conclude :

1. That plaintiffs in determining the advisability of continuing defendant as a business associate acted within the terms of the agreement of 1899, and in good faith.

2. The value of $149.71 per share placed upon the common stock in the Boggs & Buhl Company held by defendant, is, under the circumstances, the fair cash value of the same, and should be accepted by the defendant as provided in the agreement.

Plaintiffs are entitled to a decree as prayed for.

Exceptions to the adjudication were dismissed by the court, FRAZER, P. J., filing the following opinion :

We have examined the exceptions in connection with the testimony and are not convinced that any of our findings or conclusions should be changed. All the findings and conclusions excepted to were fully considered at the time of their being prepared, and the argument of counsel has not satisfied us that any changes should be made.

The exception most seriously argued was the one relating to the price per share at which the common stock was appraised. Whether we were right in finding that the value fixed by the stockholders at $149.71 is correct, depends entirely upon whether $1,000,000 for good will should be added to the value represented by goods and tangible property applicable to that stock. If that amount should be added, the appraisement is entirely too low ; if not, in our opinion, it is not unfair. At the time of preparing our findings and conclusions, we carefully considered this question and concluded that the agreement of April 20, 1899, contemplated in the event of the stock of a member being purchased by the other members, the purchaser should only be required to pay for it according to its real value as represented by tangible property. We have not been convinced that we were in error in reaching this conclusion. At the time the stock was issued it was not represented by any property and had no value, and to-day its value depends entirely upon the value of the corporation's property over and

above that necessary to pay debts and liquidate the preferred stock. As that surplus property fluctuates, so does the actual value of the common stock rise or fall. When we consider all the circumstances, that is, that the stock when issued had no value, that the persons owning it must be actively engaged in the management of the corporation, that it is never sold on the market, and that the preferred stock is subject to redemption at any time, it seems to us that its cash value is the price shown by the value of the assets of the corporation applicable to it, which in this case at the time of the appraisement was approximately $149.71 per share. The argument that the offer of Messrs. Boggs and Buhl to sell 1,500 shares of their common stock holdings to employees at $200 per share is evidence of a greater value than $149.71, is not sound, in our judgment. In that offer Messrs. Boggs and Buhl agreed to sell with no other security for the purchase money than the stock itself, and to accept payment at such times and in such amounts as might suit the purchaser. Such terms would not indicate a cash value.

After giving full consideration to the agreement of 1899 and the testimony of the various witnesses we are unable to reach any other conclusion than that the value fixed at the stockholders' meeting is in accordance with the terms of the agreement, and is just. The remaining exceptions, it seems to us, are sufficiently answered in the argument which is a part of our findings of fact and conclusions of law.

Exceptions dismissed.

*Error assigned* was the decree of specific performance.

*William B. Rodgers* with him *J. Rodgers McCreery* and *Edwin S. Craig*, for appellant, cited as to the appraisement: Lindsay's Est., 210 Pa. 224.

*Willis F. McCook* and *J. S. Ferguson*, with them *E. G. Hartje*, for appellees, cited as to the appraisement: New England Trust Co. v. Abbott, 162 Mass. 148 (38 N. E. Repr. 432).

PER CURIAM, January 7, 1907:
Decree affirmed on the opinion of the court below.